**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| PARTS iD, Inc., *et al.*,[1] | Case No. 23-12098 (LSS) |
|  | (Jointly Administered) |
| Debtors. | **Re: D.I. 14, 15, 74, 95 & 138** |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT
OF AN ORDER APPROVING THE DISCLOSURE STATEMENT
FOR, AND CONFIRMING, THE JOINT PREPACKAGED CHAPTER 11
PLAN OF REORGANIZATION OF PARTS ID, INC. AND PARTS ID, LLC**

**DLA PIPER LLP (US)**

R. Craig Martin, Esq. (DE 5032)
1201 N. Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: craig.martin@us.dlapiper.com

Erik F. Stier (admitted *pro hac vice*)
500 8th Street, NW
Washington, D.C. 20004
Telephone: (202) 799-4258
Facsimile: (202) 799-5000
Email: erik.stier@us.dlapiper.com

*Counsel to the Debtors*

**Dated**: January 30, 2024

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PARTS iD, Inc. (4868), and PARTS iD, LLC (5607).  The corporate headquarters and the mailing address for the Debtors is 1 Corporate Drive, Suite C, Cranbury, NJ 08512.

## TABLE OF CONTENTS

**Page**

RELIEF REQUESTED.................................................................................................1

PRELIMINARY STATEMENT ...............................................................................2

BACKGROUND ......................................................................................................3

I.      Company Background and Prepetition Restructuring Efforts ........................... 3

II.     The Debtor-in-Possession Facility and Equitization of DIP Claims ................. 4

III.    The Direct Investment Preferred Equity Raise ................................................ 5

IV.    Cancellation of Existing Equity ...................................................................... 5

V.     Solicitation and Voting Results ...................................................................... 6

ARGUMENT ...........................................................................................................9

I.      The Court Should Approve the Disclosure Statement and Find That the Debtors Complied with the Scheduling Order. ............................................................ 9

        A.     *The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code.* ................................................................................................9

        B.     *The Debtors Complied with the Court's Scheduling Order.*................................13

II.     The Plan Satisfies Each Requirement for Confirmation Under Section 1129 of the Bankruptcy Code and Should Be Confirmed.................................................... 15

        A.     *Section 1129(a)(1): The Plan Complies with Applicable Provisions of the Bankruptcy Code.*........................................................................................16

        B.     *Section 1129(a)(2): The Debtors Have Complied with Applicable Provisions of the Bankruptcy Code.*........................................................................33

        C.     *Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law.* ........................................................................34

        D.     *Section 1129(a)(4): The Payment of Services and Expenses Is Subject to Bankruptcy Court Approval.* ...............................................................................35

        E.     *Section 1129(a)(5): Necessary Information Regarding the Identity of Directors and Officers Has Been Disclosed.* ........................................................36

F.      *Section 1129(a)(7): The Plan Is in the Best Interests of Creditors and Interest Holders.* ...................................................................................36

G.      *Section 1129(a)(8) and (10): Acceptance by Impaired Class.* ..............................39

H.      *Section 1129(a)(9): The Plan Provides for Payment in Full of Allowed Priority Claims.* ..................................................................................39

I.       *Section 1129(a)(11): The Plan Is Feasible.* ............................................................40

J.      *Section 1129(a)(12): The Plan Provides for Full Payment of Statutory Fees.* ......................................................................................................42

K.      *Sections 1129(a)(6), 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) Are Inapplicable.* .................................................................42

L.      *The Plan Complies with Section 1129(b) of the Bankruptcy Code.* .......................43

M.     *The Plan Complies with Sections 1129(c)-(e) of the Bankruptcy Code.* ................47

III.    Cause Exists to Waive the Stay of the Confirmation Order. ............................................ 48

IV.    Plan Modifications Do Not Require Re-Solicitation ........................................................ 48

V.    Objections to the Plan Should be Overruled .................................................................... 51

A.      *Google Objection* ..................................................................................................51

B.      *IDParts Objections* ...............................................................................................54

CONCLUSION ..................................................................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 11,111, Inc.,*
117 B.R. 471 (Bankr. D. Minn. 1990) ....................................................................................44

*In re Am. Solar King Corp.,*
90 B.R. 808 (Bankr. W.D. Tex. 1988) ....................................................................................48

*In re Ambanc La Mesa Ltd. P'ship,*
115 F.3d 650 (9th Cir. 1997) ....................................................................................44

*In re Armstrong World Indus., Inc.,*
348 B.R. 111 (D. Del. 2006) ....................................................................................15

*In re Autobacs Strauss, Inc.,*
473 B.R. 525 (Bankr. D. Del. 2012) ....................................................................................11

*In re Aztec Co.,*
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ....................................................................................44

*In re Bowles,*
48 B.R. 502 (Bankr. E.D. Va. 1985) ....................................................................................44

*In re Buttonwood Partners, Ltd.,*
111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) ....................................................................................44

*In re Century Glove, Inc.,*
No. 90-400-SLR, 1993 WL 239489 (D. Del. Feb. 10, 1993) ...........................................33, 49

*In re City of Detroit,*
524 B.R. 147 (Bankr. E.D. Mich. 2014) ....................................................................................49

*In re Coram Healthcare Corp.,*
315 B.R. 321 (Bankr. D. Del. 2004) ....................................................................................27

*In re Crowthers McCall Pattern, Inc.,*
120 B.R. 279 (Bankr. S.D.N.Y. 1990) ....................................................................................36

*In re Dakota Rail, Inc.,*
104 B.R. 138 (Bankr. D. Minn. 1989) ....................................................................................11

*In re Drexel Burnham Lambert Grp, Inc.,*
960 F.2d 285 (2d Cir. 1992) ....................................................................................30

*In re Enron Corp.*,
  326 B.R. 497 (S.D.N.Y. 2005).........................................................................................30

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) ..............................................................................46

*In re Ferretti*,
  128 B.R. 16 (Bankr. D.N.H. 1991) ...............................................................................11

*First Fid. Bank v. McAteer*,
  985 F.2d 114 (3d Cir. 1993)...........................................................................13, 24, 27

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) .......................................................................44

*In re Frontier Airlines, Inc.*,
  93 B.R. 1014 (Bankr. D. Colo. 1988). Bankruptcy .......................................................48

*In re Granite Broad. Corp.*,
  369 B.R. 120 (Bankr. S.D.N.Y. 2007) ..........................................................................46

*Hargreaves v. Nuverra Envtl. Sols., Inc. (In re Nuverra Envtl. Sols., Inc.)*,
  590 B.R. 75 (D. Del. 2018) ...........................................................................................16

*Hsin Chi Su v. Offshore Grp. Inv. Ltd. (In re Vantage Drilling Int'l)*,
  603 B.R. 538 (D. Del. 2019) .........................................................................................24

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) .......................................................................24, 27

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636 (2d Cir. 1988)....................15, 44

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988).........................................................................................39

*In re Lakeside Glob. II, Ltd.*,
  116 B.R. 499 (Bankr. S.D. Tex. 1989) .........................................................................39

*In re LMR, LLC*,
  496 B.R. 410 (Bankr. W.D. Tex. 2013).........................................................................49

*In re Lucira Health, Inc.*,
  Case No. 23-10242 (MFW) (Bankr. D. Del. Sept. 19, 2023) .......................................28

*In re Mount Vernon Plaza Cmty. Urban Redev. Corp. I,*
   79 B.R. 305 (Bankr. S.D. Ohio 1987) ....................................................49

*In re New Valley Corp.,*
   168 B.R. 73 (Bankr. D.N.J. 1994) ........................................................34

*In re Ninepoint Medical, Inc.,*
   Case No. 20-12618 (KBO) (Bankr. D. Del. Jan. 7, 2021) ....................28

*In re Nutritional Sourcing Corp.,*
   398 B.R. 816 (Bankr. D. Del. 2008) .....................................................15

*In re PES Holdings, LLC,*
   Case No. 18-10122 (KG) (Bankr. D. Del. Apr. 2, 2018) .....................28

*In re Phoenix Services Topco, LLC, et al.,*
   Case No. 22-10906 (MFW) (Bankr. D. Del. June 21, 2023) ................28

*In re Premier Int'l Holdings, Inc.,*
   No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ................15, 29, 31

*In re PWS Holding Corp.,*
   228 F.3d 224 (3d Cir. 2000) .................................................................29

*In re Regent Commc'ns., Inc.,*
   2010 Bankr. LEXIS 5793 (Bankr. D. Del. Apr. 12, 2010) ...................27

*In re Resorts Int'l Inc.,*
   145 B.R. 412 (Bankr. D.N.J. 1990) ................................................33, 35

*In re Revitalid Pharmaceutical Corp. et al.,*
   Case No. 23-11704 (BLS) (Bankr. D. Del. Nov. 20, 2023) ..................28

*In re Rivera Echevarria,*
   129 B.R. 11, 13 (Bankr. D.P.R. 1991) .................................................44

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,*
   81 F.3d 355 (3d Cir. 1996) ...................................................................11

*In re Spansion,*
   426 B.R. 114 (Bankr. D. Del. 2010) ...........................................23, 24, 27

*In re Spansion,*
   No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. 2010) ..........29

*In re Sun Country Dev., Inc.,*
   764 F.2d 406, 408 (5th Cir.1985) ........................................................34

*In re Temple Zion*,
  125 B.R. 910 (Bankr. E.D. Pa. 1991) ...................................................................49

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) ...................................................................24

*In re Valeritas Holdings, Inc., et. al.*,
  Case No. 20-10290 (LSS) (Bankr. D. Del. June 8, 2020).....................................28

*In re W. Real Est. Fund, Inc.*,
  75 B.R. 580 (Bankr. W.D. Okla. 1987) ...............................................................43

*In re W.R. Grace & Co.*,
  446 B.R. 96 (Bankr. D. Del. 2011) .....................................................................29

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012)..................................................................................36

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013).................................................................................16

*In re Wash. Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) ..............................................................24, 27

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ........................................................... *passim*

**Statutes**

11 U.S.C. § 105(a) ...................................................................................................31

11 U.S.C. § 507(a)(2) ...............................................................................................41

11 U.S.C. § 1123(a)(1)..............................................................................................18

11 U.S.C. § 1123(a)(2)..............................................................................................18

11 U.S.C. § 1123(a)(4)..............................................................................................19

11 U.S.C. § 1123(a)(5)....................................................................................19, 20, 21

11 U.S.C. § 1123(a)(6)..............................................................................................20

11 U.S.C. § 1123(b) ..................................................................................................22

11 U.S.C. § 1126(b)(1) ..............................................................................................10

11 U.S.C. § 1129(a)(5)(A)(i) .....................................................................................35

11 U.S.C. § 1129(a)(5)(A)(ii) ...........................................................................................21, 35

11 U.S.C. § 1129(a)(7)(A) ......................................................................................................36

11 U.S.C. § 1129(a)(8)............................................................................................................38

11 U.S.C. §1129(b)(1) .......................................................................................................42, 44

11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii) ....................................................................................46

28 U.S.C. § 1930(a)(6)............................................................................................................41

**Other Authorities**

FED. R. BANKR. P. 2002 ............................................................................................................9

FED. R. BANKR. P. 3018(c) ....................................................................................................14

FED. R. BANKR. P. 3019 ...........................................................................................9, 48, 49, 50

FED. R. BANKR. P. 3020(e) ....................................................................................................47

H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 412 (1977), reprinted in 1978
   U.S.C.C.A.N. 5963 .........................................................................................................33

H.R. Rep. No. 95-595 (1977).................................................................................................15

S. Rep. No. 95-989 (1978).....................................................................................................15

## **RELIEF REQUESTED**

1.      The above-captioned debtors and debtors in possession (collectively, the "Debtors" and, as reorganized, the "Reorganized Debtors") respectfully submit this memorandum of law (this "Memorandum") in support of approval of the *Disclosure Statement Relating to the Joint Prepackaged Chapter 11 Plan of Reorganization of Parts iD, Inc. and Parts iD, LLC* [D.I. 15] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") and confirmation of the *Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization of Parts iD, Inc. and Parts iD, LLC,* filed contemporaneously herewith (as modified, amended, or supplemented from time to time, the "Plan"),[2] under sections 1125, 1126, and 1129 of title 11 of the United States Code (the "Bankruptcy Code").

2.      In support of the Plan, the Debtors filed the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* [D.I. 137] (the "Voting Declaration"), and concurrently herewith are filing the *Declaration of Lev Peker in Support of an Order Approving the Disclosure Statement for, and Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of PARTS iD, Inc. and PARTS iD, LLC* (the "Peker Declaration") In further support of approval of the Disclosure Statement and confirmation of the Plan, the Debtors respectfully state as follows:

---

[2]      Capitalized terms not otherwise defined have the meanings ascribed to them in the Plan or the *Declaration of Lev Peker in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 19] (the "First Day Declaration).

## PRELIMINARY STATEMENT

3.      The Debtors are seeking confirmation of their prepackaged Plan—the ultimate step in their year-long effort to reset relationships with Vendors and address the Debtors' prepetition liquidity crisis.  The Plan has received overwhelming support of each of the voting classes.

4.      Upon confirmation of the Plan, followed by prompt emergence from these Chapter 11 Cases, the recapitalized Reorganized Debtors will close this chapter of their history and will be able to focus on what they do best: leverage their technology-driven e-commerce platform to provide customers with unparalleled access to vehicle parts and provide Vendors of those parts with a reliable revenue stream.

5.      The Plan, which has garnered overwhelming support from the Debtors' largest stakeholders, is the product of extensive negotiations with key stakeholders that features (i) satisfaction of all of the Debtors prepetition secured debt, (ii) equitizing the prepetition bridge financing extended to the Debtors, (iii) payment to Vendors consistent with the heavily negotiated prepetition Vendor RSA, (iv) additional liquidity in the form of a preferred equity investment in the amount of $26,000,000, (v) reinstatement of all customer obligations, and (vi) cancellation and deregistration of all securities issued by PARTS iD, Inc., so that it is no longer publicly traded in an effort to further reduce controllable costs.  The Plan was solicited prior to commencement of these Chapter 11 Cases to holders of Class 3 Senior Secured Note Claims (which voted *unanimously* to accept the Plan), Class 4 MCA Claims (which voted *unanimously* to accept the Plan), Class 5 Subordinated Secured Claims (which voted *unanimously* to accept the Plan), Class 7 Vendor Claims (98.6% by value of which voted to accept the Plan), and Class 8 Convenience Claims (99.5% by value of which voted to accept the Plan).

6.      With the support of the Plan Sponsor, the Debtors seek confirmation of the Plan followed by a quick emergence as a financially stronger private company with the resources and

support to fuel long-term viability.  As the Plan was near unanimously supported by all impaired creditors entitled to vote, it should come as little surprise that no objections to the Plan were filed by any voting stakeholders.  With respect to the objections that were filed, they have either been addressed, resolved, or responded to in this Memorandum and, if not resolved by the time of the hearing, should be denied for the reasons argued below.

## **BACKGROUND**[3]

### I.    **Company Background and Prepetition Restructuring Efforts**

7.    The Debtors are a technology-driven digital commerce company specializing in the U.S. automotive aftermarket and adjacent complex parts markets.  The Debtors operate a purpose-built technology platform and a product catalog spanning up to eighteen million parts and accessories.  To fulfill customer orders, the Debtors utilize application-programming interfaces with Vendors that allow the Debtors to electronically transmit orders, check inventory availability, receive shipment tracking information, and offer products from over 5,000 brands on an inventory-free basis.  Accordingly, with limited inventory of their own, the Debtors' business relies on their relationship with Vendors.

8.    As described in detail in the First Day Declaration and the Disclosure Statement, recent economic conditions caused supply chain disruptions and fluctuations in business and consumer confidence, which negatively impacted the Debtors' business.  These conditions led to significant declines in the Debtors' revenue, margins, and liquidity, and resulted in the Debtors' inability to make timely payments to Vendors.  In response to these operational and financial challenges, the Debtors engaged in extensive negotiations with Vendors to maintain their support while actively pursuing financing to stabilize their balance sheet and assure Vendors of the

---

[3]    A detailed description of the Debtors and their businesses, as well as the facts and circumstances that led to the filing of these Chapter 11 Cases, are set forth in greater detail in the First Day Declaration.

Debtors' ability to meet future obligations.  In October 2023, the Debtors and a committee of Vendors entered into the Vendor RSA.  In the Vendor RSA, the Debtors agreed to pay acceding Vendors 55% of outstanding invoiced amounts in a structured payment plan.  The effective date under the Vendor RSA was conditioned upon the accession of Vendors holding at least 80% of the total amount of all Vendor claims for past due invoices within 30 days of the Debtors' execution of the Vendor RSA.  Despite the Debtors' efforts, they did not timely achieve the requisite support and the Vendor RSA did not become effective in accordance with its terms.  Furthermore, the Debtors were unable to raise sufficient capital outside of bankruptcy to fund the payments contemplated by the Vendor RSA.

9.      In November 2023, the Debtors began working with SRV Partners, LLC ("SRVP"), a restructuring and turnaround firm, to pursue and evaluate options to address the Debtors' debt and explore strategic alternatives that would allow the Debtors to honor their commitment to Vendors under the Vendor RSA.  The Debtors' efforts to secure funding to affect those transactions led to negotiations with the Plan Sponsor regarding prepetition and postpetition financing and the material terms and conditions of the restructuring transactions that the Debtors are now pursuing in this Court through confirmation of the Plan.

## II.      The Debtor-in-Possession Facility and Equitization of DIP Claims

10.     To fund their operations during these proceedings, the Plan Sponsor provided the Debtors a debtor in possession financing facility (the "DIP Facility"), which was approved by this Court by the interim order entered on December 29, 2023 [D.I. 60] and final order entered on January 19, 2024 [D.I. 115].  The DIP Facility is a secured superpriority debtor-in-possession financing facility consisting of (i) a roll-up of certain prepetition loans into term loans under the DIP Facility in the aggregate amount of approximately $6.3 million (the "DIP Roll-Up Loans"), and (ii) a new money term loan available in an amount of up $6 million in connection with the

4

Plan (the "DIP New Money Loans").[4]  As of the date hereof, the Debtors have borrowed $4.0 million available under the DIP Facility.

11.     Under the Plan, in full and final satisfaction of the DIP New Money Loans, the Reorganized Debtors will issue to Fifth Star, Inc., in its capacity as DIP Lender, its pro rata share of New Preferred Stock.  In full and final satisfaction of the DIP Roll-Up Loans, the Reorganized Debtors will issue New Common Stock, with the exception of $1,000,000 of DIP Roll-Up Loans which shall be satisfied by payment in Cash.

## III.    The Direct Investment Preferred Equity Raise

12.     Under the Plan, the Plan Sponsor has committed to purchase $26,000,000 of New Preferred Stock, which will be used by the Reorganized Debtors (i) in an amount of up to $18,600,000 to fund distributions under the Plan, and (ii) to fund general operating expenses of the Reorganized Debtors.

## IV.    Cancellation of Existing Equity

13.     Under the Plan, all existing equity in PARTS iD, Inc. will be cancelled.  On or around the Effective Date of the Plan, PARTS iD, Inc. will file a Form 15 Certification and Notice of Termination of Registration with the Securities and Exchange Commission to deregister all of its registered classes of shares.  The reasoning behind the Company's decision to deregister is aimed at realigning the Debtors' operating environment and ensuring that the Reorganized Debtors are nimble and well positioned to unlock value through efficiencies, such as the elimination of costs and expenses that come with being a public company.

---

[4]      Pursuant to the DIP Credit Agreement, an additional principal amount of $6,000,000 may be made available upon the occurrence of a Toggle Event (as defined in the DIP Credit Agreement).

V.      **Solicitation and Voting Results**

14.     On December 20, 2023, and as more fully described in the Debtors' Scheduling Motion,[5] the Debtors caused their solicitation agent, Kroll Restructuring Administration, LLC (the "Solicitation Agent"), to distribute packages (the "Solicitation Packages") to Holders of Claims entitled to vote to accept or reject the Plan as of December 8, 2023 (the "Voting Record Date"). The Solicitation Packages included the Disclosure Statement and exhibits thereto, including the Plan, the Liquidation Analysis, the Vendor Restructuring Support Agreement, Financial Projections, the Solicitation Cover Letter, and the applicable Ballot(s) to Holders of Claims in the Voting Classes as of the Voting Record Date.  Holders of Class 3, Class 4, Class 5, Class 7, and Class 8 Claims were given clear instructions, set forth in the Ballots, explaining how to complete and submit their respective Ballots.  Each Holder was explicitly informed in the Disclosure Statement and on the Ballot that such Holder was required to submit a Ballot—if such Ballot were to be counted—so that it would be actually received by the Solicitation Agent on or before 4:00 p.m. (ET) on January 8, 2024.  During the hearing held on December 28, 2023 (the "First Day Hearing"), the Debtors agreed to extend the voting deadline to 4:00 p.m. (ET) on January 16, 2024 (the "Voting Deadline") and provided notice of such extension in the Combined Hearing Notice.

15.     On December 29, 2023, the Debtors caused the Solicitation Agent to distribute to Holders of Class 9 General Unsecured Claims a flash drive containing electronic copies of the Disclosure Statement and exhibits thereto, including the Plan, the Liquidation Analysis, the

---

[5]      *Debtors Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving Related Dates, Deadlines, Notices, and Procedures, (III) Approving the Solicitation Procedures and Related Dates, Deadlines, Notices, and (IV) Conditionally Waiving the Requirements that (A) the U.S. Trustee Convene a Meeting of Creditors and (B) the Debtors File Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Reports* [D.I. 13] (the "Scheduling Motion").  This Court approved the Scheduling Motion on January 8, 2024 [D.I. 70] (the "Scheduling Order").*

Vendor Restructuring Support Agreement and Financial Projections, together with a Notice of Impaired Status and the Combined Hearing Notice [D.I. 118].

16.    Holders of all other Claims and Interests were not provided a Solicitation Package as such Holders are, under the Plan, either Unimpaired (and conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code) or Impaired, but conclusively presumed to reject the Plan under section 1126(g) of the Bankruptcy Code.  However, Class 12 Claims received a Notice of Impaired Status and the Combined Hearing Notice [D.I. 118]. Holders of Class 13 Claims received a Notice of Unimpaired Status and the Combined Hearing Notice [D.I. 130].

17.    Shortly after commencing these Chapter 11 Cases, the Debtors filed, among other things, the Plan, the solicitation version of the Disclosure Statement, and the Scheduling Motion, under which the Debtors sought a combined hearing for approval of the Disclosure Statement and confirmation of the Plan.  On January 8, 2024, the Court entered the Scheduling Order, which (a) established January 26, 2024, at 4:00 p.m. (ET), as the deadline to object to the adequacy of the Disclosure Statement and confirmation of the Plan, (b) approved the solicitation procedures on votes to accept or reject the Plan (the "Solicitation Procedures"), and (c) approved the form of the Combined Hearing Notice, the Publication Notice, and the Notices of Impaired Status (as these terms are defined in the Scheduling Motion).

18.    On December 29, 2023, the Debtors caused the Solicitation Agent to serve the Combined Hearing Notice and the Notices of Impaired Status on creditors and interest holders, as applicable, notice parties, and other parties in interest, as described in detail in the Solicitation Agent's affidavit of service.  [*See* D.I. 118].  Both the Combined Hearing Notice and the Publication Notice informed recipients of: (a) the commencement of the Chapter 11 Cases; (b) the extension of the Voting Deadline to January 16, 2024; (c) the date and time set for the Confirmation

Hearing; (d) the deadline for filing objections to the Plan and Disclosure Statement; and (e) the discharge, exculpation, and release provisions of the Plan. On January 2, 2024, consistent with the Scheduling Order and Bankruptcy Rule 2002(l), the Debtors published notice of the Confirmation Hearing and other key dates in the *New York Times National Edition* (the "Publication Notice"). *See Certificate of Publication* [D.I. 65].

19.     On January 8, 2024, the Debtors filed the *Notice of Filing Plan Supplement to the Joint Prepackaged Chapter 11 Plan of Reorganization of PARTS iD, Inc. and PARTS iD, LLC* [D.I. 74] (the "Initial Plan Supplement"). On January 26, 2024, the Debtors filed the *Notice of Filing Plan Supplement to the First Amended Joint Prepackaged Chapter 11 Plan of Reorganization of PARTS iD, Inc. and PARTS iD, LLC* [D.I. 138] (the "Second Plan Supplement," and together with the Initial Plan Supplement, the "Plan Supplement").

20.     On January 12, 2024, the Debtors filed the *First Amended Joint Prepackaged Chapter 11 Plan of Reorganization of PARTS iD, Inc. and PARTS iD, LLC* [D.I. 95] and on January 12, 2024, caused the Solicitation Agent to serve Holders of Class 13 Claims with the Notice of Unimpaired Status and the Combined Hearing Notice [D.I. 130].

21.     The Debtors completed their final tabulation of Ballots after the Voting Deadline, following a complete review and audit of all Ballots received. As set forth in the Voting Declaration and illustrated below, the voting results were unanimously in favor of the Debtors' restructuring and acceptance of the Debtors' Plan.

| Class | Class Description | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting | Class Voting Result |
|-------|------------------|------------------|------------------|------------------|------------------|---------------------|
| 3 | Senior Secured Note Claims | 1 (100%) | 0 (0%) | $4,879,298.00 (100%) | $0.00 (0%) | Accept |
| 4 | MCA Claims | 2 (100%) | 0 (0%) | $2,618,000.00 (100%) | $0.00 (0%) | Accept |

| 5 | Subordinated Secured Note Claims | 4 (100%) | 0 (0%) | $7,467,708.00 (100%) | $0.00 (0%) | Accept |
| 7 | Vendor Claims | 114 (96.61%) | 4 (3.39%) | $25,638,537.25 (98.64%) | $353,694.30 (1.36%) | Accept |
| 8 | Convenience Claims | 83 (97.65%) | 2 (2.35%) | $293,594.18 (99.54%) | $1,362.40 (0.46%) | Accept |

22.    On January 30, 2024, concurrently with the filing of this Memorandum, the Debtors submitted to the Court a proposed order confirming the Plan (the "Confirmation Order").

**ARGUMENT**

23.    In Part I of this Memorandum, the Debtors request final approval of the Disclosure Statement and a finding that the Debtors complied with the Court's Scheduling Order.  In Part II of this Memorandum, the Debtors argue that the Plan satisfies section 1129 of the Bankruptcy Code.  In Part III, the Debtors submit that good cause exists to waive the stay of the Confirmation Order.  In Part IV, the Debtors submit that the Plan satisfies section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  Accordingly, the Debtors request that the Court confirm the Plan.  In Part V, the Debtors submit responses to the Objections.   For the reasons stated in this Memorandum, and the evidentiary support to be offered at the Combined Hearing, the Debtors respectfully request that the Court approve the Disclosure Statement and confirm the Plan.

**I.    The Court Should Approve the Disclosure Statement and Find That the Debtors Complied with the Scheduling Order.**

**A.    *The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code.***

24.    To establish that a prepetition solicitation of votes to accept or reject a plan should be approved, the Court must find that the solicitation complied with sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rules 2002, 3017(d), and 3018(b)-(c).

25.     Section 1125(g) of the Bankruptcy Code provides that "an acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law." 11 U.S.C. § 1125(g).  Section 1126(b) of the Bankruptcy Code states that "a holder of a claim or interest that has accepted or rejected the plan before the commencement of the case . . . is deemed to have accepted or rejected such plan [in the chapter 11 case]" so long as the debtor has complied with "applicable nonbankruptcy law . . . governing the adequacy of disclosure in connection with such solicitation." 11 U.S.C. § 1126(b)(1).  If no such nonbankruptcy law applies, then the debtor's disclosure statement must contain "adequate information" as defined under section 1125(a) of the Bankruptcy Code.  *Id*. § 1126(b)(2).  In other words, prepetition solicitations must either comply with applicable federal or state securities laws and regulations (including the registration and disclosure requirements) or, if such laws and regulations do not apply, the solicited holders must receive "adequate information," as such term is defined in section 1125(a)(1) of the Bankruptcy Code.

26.     The Debtors satisfied sections 1125(g) and 1126(b), as applicable, of the Bankruptcy Code.  Here, the Debtors' prepetition solicitation is, at a minimum, exempt from the registration requirements of the Securities Act of 1933 (as amended, the "Securities Act") under one or more of the exceptions from registration provided thereunder, including section 4(a)(2) and/or Regulation D thereof, exempting the Debtors' prepetition solicitation from the disclosure and registration requirements of the Securities Act, state "Blue Sky" laws, or any similar rules, regulations, or statutes.  Specifically, section 4(a)(2) of the Securities Act and Regulation D thereof create an exemption from registration for transactions not involving a "public offering."  The prepetition solicitation did not constitute a public offering, because (a) no Holders of Claims in the

10

Voting Classes will receive any Securities pursuant to the Plan, and (b) the manner in which the

Debtors conducted the solicitation did not otherwise constitute a general solicitation.  Therefore,

the requirements of section 1126(b)(1) of the Bankruptcy Code are inapplicable to the Debtors'

prepetition solicitation.  As discussed more fully below, the Debtors will seek a determination

from the Court at the Combined Hearing that all solicited Holders received "adequate information"

as defined by section 1125(a) of the Bankruptcy Code in accordance with section 1126(b)(2) of

the Bankruptcy Code.

27.    Thus, the relevant disclosure standard here is set forth in section 1126(b)(2), which,

as noted above, requires that the Debtors solicited acceptance or rejection of the Plan "after

disclosure . . . of adequate information, as defined in section 1125(a) of [the Bankruptcy Code]."

11 U.S.C. § 1126(b)(2).  Section 1125(a)(1) of the Bankruptcy Code provides:

> "[A]dequate information" means information of a kind, and in sufficient
> detail, as far as is reasonably practicable in light of the nature and history of
> the debtor and the condition of the debtor's books and records, including a
> discussion of the potential material Federal tax consequences of the plan to
> the debtor, any successor to the debtor, and a hypothetical investor typical
> of the holders of claims or interests in the case, that would enable such a
> hypothetical investor of the relevant class to make an informed judgment
> about the plan . . . .

11 U.S.C. § 1125(a)(1).

28.    A debtor's disclosure statement must, as a whole, provide information that is

sufficiently detailed, so far as "reasonably practicable," to permit an "informed judgment" by

impaired creditors entitled to vote on the plan.  *See Ryan Operations G.P. v. Santiam-Midwest

Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996); *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 584

(Bankr. D. Del. 2012); *In re Dakota Rail, Inc.*, 104 B.R. 138, 142 (Bankr. D. Minn. 1989).  At a

minimum, a disclosure statement "must clearly and succinctly inform the average unsecured

creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

29.     In evaluating the information contained in a disclosure statement, courts consider factors such as: the disclosure statement's audience; the ability to obtain information from other sources, such as SEC filings; the sophistication of those entitled to vote on the plan and their involvement in negotiations with the debtor prior to voting; and documents made available to voting parties prior to voting. *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 99-100 (Bankr. D. Del. 1999).

30.     Here, the Disclosure Statement contains descriptions and summaries of, among other things, the following: (a) both the Plan and the Debtors' related reorganization efforts; (b) certain events and relevant negotiations preceding the commencement of these chapter 11 cases; (c) the key terms of the Plan Restructuring; (d) risk factors affecting consummation of the Plan and the Plan Restructuring; (e) a liquidation analysis setting forth an estimated recovery that Holders of Claims and Interests would receive in a hypothetical chapter 7 case; (f) financial information that is relevant in determining whether to accept or reject the Plan; (g) securities law consequences of the Plan; (h) federal tax law consequences of the Plan; (i) classification and treatment of Claims and Interests under the Plan, including which Classes were entitled to vote; (j) the Debtors' corporate history, corporate structure, business operations, and prepetition capital structure; (k) the effects of confirmation of the Plan; and (l) the releases and exculpations contemplated under the Plan.

31.     Moreover, because the PARTS iD, Inc. is a public company, substantial information is available about the business through various public filings, for example, the Debtors filed Form 8-K's with the SEC regarding the various secured claims that make up Classes 3, 4,

12

and 5 at the time that debt was issued.[6] For these reasons and the reasons set forth above, the Debtors submit that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code in satisfaction of section 1126(b)(2) and should be approved.

**B.    *The Debtors Complied with the Court's Scheduling Order.***

32.    On January 8, 2024, the Court entered the Scheduling Order, which, among other things: (a) scheduled the combined hearing on the adequacy of the Disclosure Statement and confirmation of the Plan; (b) approved the form and manner of the Combined Hearing Notice and the Equity Notice; and (c) approved the form and manner of the Publication Notice.  The Debtors complied with each of the deadlines and procedures approved by the Court under the Scheduling Order.

*a.   The Debtors Complied with the Scheduling Order's Notice Requirements.*

33.    The Debtors satisfied the notice requirements set forth in the Scheduling Order, Bankruptcy Rule 3017, and Rule 3017-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):

- First, on December 20, 2023, the Debtors caused the Solicitation Agent to distribute the Solicitation Packages to certain Holders of Claims in the Voting Classes that had entered into non-disclosure agreements with the Debtors and were entitled to vote to accept or reject the Plan as of the Voting Record Date, as discussed in detail in the Solicitation Agent's affidavit of service [D.I. 37].

- Second, on the December 26, 2023, before the commencement of these Chapter 11 Cases, the Debtors caused the Solicitation Agent to distribute the Solicitation Packages to the balance of voters within the Voting Classes for Holders of Claims entitled to vote to accept or reject the Plan as of the Voting Record Date, as discussed in detail in the Solicitation Agent's affidavit of service [D.I. 37].

- Third, on December 29, 2023, the Debtors caused the Solicitation Agent to mail the Combined Hearing Notice to creditors, notice parties and other parties in interest, and

---

[6]    The Debtors filed Form 8-Ks with respect to the secured claims that comprise Classes 3, 4 and 5 on March 6, 2023, July 17, 2023, October 13, 2023, and December 6, 2023.

the Notices of Impaired Status to Holders of Claims in Classes 9, 10, 11, and 12, as described above and as discussed in detail in the Solicitation Agent's affidavit of service [D.I. 118]. The Debtors caused the Solicitation Agent to mail the Combined Hearing Notice and Notice of Unimpaired Status on Holders of Claims in Class 13 on January 12, 2024 [D.I. 130].

- <u>Fourth</u>, as discussed above, the Debtors caused the Publication Notice to be published in the *New York Times National Edition* on January 2, 2024.

- <u>Fifth</u>, the Combined Hearing Notice included instructions on how to obtain the Plan and the Disclosure Statement without a fee through the Debtors' restructuring website, in addition to informing recipients of: (a) the commencement of the Chapter 11 Cases; (b) the date and time set for the Confirmation Hearing; (c) the deadline for filing objections to the Plan and Disclosure Statement; and (d) the discharge, exculpation, and release provisions of the Plan.

   *b. The Ballots Complied with the Scheduling Order.*

34. The form of Ballot used complies with the Bankruptcy Rules and was approved by the Court under the Scheduling Order. No party has objected to the sufficiency of the Ballot. The Debtors thus submit that they complied with the Scheduling Order and satisfied the requirements of Bankruptcy Rule 3018(c).

   *c. The Solicitation Period Complied with the Scheduling Order and Bankruptcy Rule 3018(b).*

35. The Debtors' solicitation period complied with the Scheduling Order and Bankruptcy Rule 3018(b). The Plan and Disclosure Statement were transmitted to all Holders of Claims entitled to vote on the Plan and, the solicitation period, which lasted from December 20, 2023, until January 16, 2024, was adequate under the facts and circumstances of these Chapter 11 Cases and was approved under the Scheduling Order. The Debtors submit that they complied with the Scheduling Order and satisfied Bankruptcy Rule 3018(b).

   *d. The Tabulation Procedures Complied with the Scheduling Order.*

36. The Debtors request that the Court find that the Debtors' tabulation of votes complied with the Scheduling Order. The Solicitation Agent reviewed all Ballots received in

accordance with the procedures described in the Scheduling Motion and approved in the Scheduling Order. *See* Voting Declaration. Because the Solicitation Agent complied with the Solicitation Procedures, the Debtors respectfully submit that the Court should approve the Debtors' tabulation of votes, confirming that in Classes 3, 4, 5, 7, and 8 more than two-thirds in amount and one-half in number of Claims voted to accept the Plan under section 1126(c) of the Bankruptcy Code.

> *e. The Debtors Solicited the Plan in Good Faith and in Compliance with the Bankruptcy Code.*

37.    Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan. 11 U.S.C. § 1125(e).

38.    As demonstrated in the First Day Declaration, the Peker Declaration, and the Voting Declaration, as well as the Debtors' compliance with the Scheduling Order, the Bankruptcy Code, and the Bankruptcy Rules, the Debtors at all times engaged in good faith, arm's-length negotiations with their key stakeholders and took appropriate actions in soliciting the Plan in accordance with section 1125 of the Bankruptcy Code. The Debtors, therefore, request that the Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

## II.    The Plan Satisfies Each Requirement for Confirmation Under Section 1129 of the Bankruptcy Code and Should Be Confirmed.

39.    A plan proponent must show by a preponderance of the evidence that the proposed plan satisfies each element of sections 1129(a)-(b) of the Bankruptcy Code. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119-20 (D. Del. 2006); *In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *4 (Bankr. D. Del. Apr. 29, 2010). As set forth below and

based upon the record and filings in these Chapter 11 Cases, the Plan satisfies all applicable subsections of section 1129 of the Bankruptcy Code and should be confirmed.

**A.    *Section 1129(a)(1): The Plan Complies with Applicable Provisions of the Bankruptcy Code.***

40.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) indicates that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, governing classification of claims and contents of a plan, respectively. *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636 (2d Cir. 1988). As demonstrated below, the Plan fully complies with the applicable requirements of the Bankruptcy Code.

*a.    The Plan Properly Classifies Claims and Interests as Required by Sections 1122 and 1123(a)(1) of the Bankruptcy Code.*

41.    Section 1122(a) of the Bankruptcy Code provides, in pertinent part, that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. §1122(a). Under section 1122(a), not all substantially similar claims or interests must be designated in the same class for classification structure; however, claims or interests designated to a particular class must be substantially similar to one another. *See Hargreaves v. Nuverra Envtl. Sols., Inc. (In re Nuverra Envtl. Sols., Inc.)*, 590 B.R. 75, 96 (D. Del. 2018) (quoting *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004)) ("'Section 1122 of the Code provides that claims that are not

'substantially similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes.'").

42.     Courts grant debtors broad discretion in classifying claims and equity interests under a chapter 11 plan, subject to the requirements of section 1122(a). *See id.* at 96 ("[T]here is significant flexibility in classifying claims and interests into different classes as long as a rational legal or factual basis for separate classification exists and all claims or interests within a particular class are substantially similar.").  A bankruptcy court "has 'broad discretion' to decide if a plan satisfies that requirement, and [a court] will uphold a plan's classification scheme so long as it is 'reasonable' and does not 'arbitrarily designate classes.'"  *In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013) (quoting *In the Matter of Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987)).

43.     Here, the Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code, because the Plan places Claims and Interests in each Class based on relevant criteria, including factual or legal distinctions.  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

| | |
|---|---|
| <u>Class 1</u>: | Other Priority Claims |
| <u>Class 2</u>: | Other Secured Claims |
| <u>Class 3</u>: | Senior Secured Note Claims |
| <u>Class 4</u>: | MCA Claims |
| <u>Class 5</u>: | Subordinated Secured Note Claims |
| <u>Class 6</u>: | Litigation Funding Claims |
| <u>Class 7</u>: | Vendor Claims |
| <u>Class 8</u>: | Convenience Claims |
| <u>Class 9</u>: | General Unsecured Claims |
| <u>Class 10</u>: | Intercompany Claims |
| <u>Class 11</u>: | Intercompany Interests |
| <u>Class 12</u>: | Existing Equity Interests |
| <u>Class 13</u>: | Customer Program Claims |

44.     This classification scheme has a rational basis and complies with section 1122(a) because the Claims and Interests in each particular class are substantially similar to one another. Furthermore, the classification scheme created by the Plan is based on the similar nature of Claims and Interests contained in each class, including, without limitation, the separate origins of such Claims and not on any impermissible classification factor.  The Debtors have a good-faith, valid business justification for the classification scheme under the Plan.  As noted in the Peker Declaration, the Vendor Claims and Convenience Claims in Classes 7 and 8, respectively, are critical to the Debtors' ongoing business as these creditors supply the product sold to the Customers (which themselves are passing through Unimpaired in Class 13); whereas, those Claims of Holders in Class 9 are not critical to the Debtors ongoing operations and consist largely of rejection damage claims with creditors no longer necessary to the Debtors' operations or with smaller one time claimants whose services can be readily replaced.  Similar Claims have not been placed into different classes to affect the outcome of the vote on the Plan, and the classification scheme, therefore, is not arbitrary.

45.     The Debtors submit that the standard under section 1122(a) of the Bankruptcy Code has been met, because the Plan does not reflect the grouping of dissimilar claims at all, let alone for inappropriate purposes.  Because each class consists of only substantially similar Claims or Interests, the Court should approve the classification scheme as set forth in the Plan as consistent with section 1122(a) of the Bankruptcy Code.

    b.   *The Plan Complies with Section 1123(a) of the Bankruptcy Code.*[7]

46.     Section 1123(a) of the Bankruptcy Code sets forth several requirements with which every chapter 11 plan must comply.  The Plan fully complies with each such requirement:

---

[7]     Section 1123(a)(8) of the Bankruptcy Code is not applicable because none of the Debtors are individuals.

(a)    Section 1123(a)(1): Designation of Classes of Claims and Interests

47.    Section 1123(a)(1) provides that a plan must designate, subject to section 1122, classes of claims and equity interests.  11 U.S.C. § 1123(a)(1).  As discussed above, the Plan designates thirteen different classes of Claims and Interests, consistent with the dictates of section 1122.  *See* Plan, Article III.  Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

(b)    Section 1123(a)(2): Specification of Classes That Are Not Impaired by the Plan

48.    Section 1123(a)(2) requires that a plan specify which classes of claims or interests are unimpaired by the plan.  11 U.S.C. § 1123(a)(2).  As set forth in Article III of the Plan, Claims in Classes 1, 2, 6, 11 (if the Intercompany Interests are Reinstated under the Plan, as determined by the Debtors or Reorganized Debtors, as applicable, with the consent of the Plan Sponsor), and 13 are designated as unimpaired.  (*See* Plan, Article III). Accordingly, the Plan satisfies section 1123(a)(2) of the Bankruptcy Code.

(c)    Section 1123(a)(3): Specification of Treatment of Classes that Are Impaired by the Plan

49.    Section 1123(a)(3) of the Bankruptcy Code requires that a plan specify how it will treat impaired classes of claims or interests.  11 U.S.C. § 1123(a)(3).  Article III of the Plan designates Claims or Interests in Classes 3, 4, 5, 7, 8, 9, 10, 11 (if the Intercompany Interests are cancelled under the Plan, as determined by the Debtors or Reorganized Debtors, as applicable, with the consent of the Plan Sponsor), and 12 as impaired within the meaning of section 1124 of the Bankruptcy Code and clearly specifies the treatment of the Claims and Interests in those classes.  (*See* Plan, Article III).  Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

(d)      Section 1123(a)(4): Equal Treatment Within Each Class

50.      Section 1123(a)(4) requires that a plan provide from the assets and rights of the estate the same treatment for each claim or interest within a particular class, unless any claim or interest holder agrees to receive less favorable treatment than other class members.  11 U.S.C. § 1123(a)(4).  Under the Plan, the treatment of each Claim against or Interest in the Debtors in each respective class is the same as the treatment of every other Claim or Interest in that class, unless the holder of a particular Claim has agreed to less favorable treatment for such Claim.  (*See* Plan, Article III).  Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

(e)      Section 1123(a)(5): Adequate Means for Implementation

51.      Section 1123(a)(5) requires that a plan provide "adequate means for the plan's implementation."  11 U.S.C. § 1123(a)(5).  The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions, provide the means by which the Plan will be implemented, including by:

- providing for sources of consideration for Plan Distributions in the form of (1) the New Preferred Stock, (2) the New Common Stock, and (3) a portion of the proceeds of the Direct Investment Preferred Equity Raise in an amount equal to the Plan Distribution Amount;

- providing for the deregistration of Existing Equity Interests and Issuance of New Common Stock and New Preferred Stock;

- providing for the consummation of the Direct Investment Preferred Equity Raise through which the Plan Sponsor shall purchase $26,000,000 of New Preferred Stock on the terms and conditions set forth in the Direct Investment Documents, the Plan, and the Confirmation Order;

- providing for the continued corporate existence of the Debtors after the Effective Date;

- providing for the vesting of the Debtors' assets in the Reorganized Debtors;

- reinstating the Customer Programs and honoring all obligations related thereto;

- providing for the cancelation of existing securities and agreements;

- providing for entry into the New Shareholders Agreement;

- providing for the issuance of New Governance Documents;

- providing for the appointment of the New Board;

- authorizing the Reorganized Debtors and their officers to execute documents as necessary in connection with the Plan, the Plan Supplement, among others;

- providing for the exemption from certain taxes and fees to the fullest extent permissible under section 1146(a) of the Bankruptcy Code; and

- providing for the adoption and implementation of the Management Incentive Plan.

52.    Accordingly, the Plan, together with the documents and agreements contemplated therein and in the Plan Supplement, sets forth the means for the Plan's implementation as required by section 1123(a)(5) of the Bankruptcy Code.

(f)    Section 1123(a)(6): Prohibition on the Issuance of Non-Voting Securities

53.    Section 1123(a)(6) prohibits the issuance of nonvoting equity securities and requires that the debtor's charter be amended accordingly.  11 U.S.C. § 1123(a)(6).  Here, Article IV.M of the Plan provides that the New Governance Documents will prohibit the issuance of nonvoting equity securities to the extent required under section 1123(a)(6) of the Bankruptcy Code and that the charter documents will be amended as necessary.  Thus, the Plan satisfies this provision.

(g)    Section 1123(a)(7): Provisions Regarding Directors and Officers

54.    Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."  11 U.S.C. §1123(a)(7).  Section 1123(a)(7) is augmented by section 1129(a)(5) of the Bankruptcy Code, which requires that a debtor disclose, to the extent known, the identify and affiliation of individuals proposed to serve

21

as directors, officers or voting trustees of the debtor following confirmation. 11 U.S.C. §1123(a)(5). Additionally, section 1129(a)(5)(A)(ii) requires that the appointment or continuance of any director or officer be consistent with the interests of creditors and equity securities holders and with public policy. *See* 11 U.S.C. § 1129(a)(5)(A)(ii).

55.     Here, the identities of the directors for the initial term of the New Board were disclosed in the Plan Supplement.  In subsequent terms, the directors will be selected in accordance with the New Governance Documents.  Provisions regarding the removal, appointment and replacement of members of the New Board will be set forth in the New Governance Documents. Each director and officer of the Reorganized Debtors will serve from and after the Effective Date under the terms of the applicable New Governance Documents and other constituent documents. Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

> *c.   The Plan Complies with Section 1123(b) of the Bankruptcy Code.*

56.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or retention of claims; and (d) include any other provisions not inconsistent with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1123(b)(1)-(3), (6).

57.     Consistent with section 1123(b) of the Bankruptcy Code, Article III of the Plan (a) impairs certain classes of Claims and Interests and (b) leaves unimpaired other classes of Claims. Further, Article IV.T of the Plan provides for the preservation of all Causes of Action except those that have been expressly released, and Article V.A governs the assumption and rejection (to the extent applicable) of executory contracts and unexpired leases.

58.     Also consistent with section 1123(b), the Plan includes (a) releases by the Debtors of certain parties in interest, (b) the release by certain holders of Claims of the Debtors and certain non-Debtor third parties, (c) an exculpation provision, and (d) an injunction provision prohibiting parties from, among other things, pursuing Claims and Interests otherwise released under the Plan. These provisions are proper because they are the product of extensive good-faith, arm's-length negotiations among the Debtors and their key constituents and were a material inducement for parties to support the Plan, which in all render the continuing going concern of the Debtors a reality. These provisions are also consensual and were fully and conspicuously disclosed to all parties in interest through the Ballots and the Combined Hearing Notice.

59.     Of those who voted on the Plan, 195 Holders of Claims in the Voting Classes returned ballots voting in favor of the Plan, thereby showing their consent to the Third-Party Release in the Plan.  Additionally, the Ballots provided all voting creditors with the option to "opt in" to the Third-Party Release in the Plan. Of those claimants who voted to reject the Plan, two checked the "opt in" box, showing their consent to the Third-Party Release.  The Debtors respectfully submit that the release provisions are integral components of the Plan, consistent with the Bankruptcy Code, and comply with applicable case law and, as such, should be approved.

(a)     <u>Releases by the Debtors Are Appropriate</u>.

60.     Article VIII.C of the Plan provides that, as of the Effective Date, the Debtors, the Reorganized Debtors, and their Estates will release certain claims and causes of action against certain parties in interest in the Chapter 11 Cases.  Under such provision, other than with respect to claims, causes of action, or liabilities arising out of or relating to any act or omission that constitutes actual fraud, willful misconduct or gross negligence, the following parties will be released: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Agent and DIP Lenders; (d) the Plan Sponsor; (e) the Senior Secured Lender; (f) current and former Affiliates of each Entity

in clause (a) through the following clause (g); and (g) each Related Party of each Entity in clause (a) through this clause (g); provided, however, that, notwithstanding the foregoing, any holder of a Claim or Interest that is not a Releasing Party shall not be a "Released Party."

61.     Notwithstanding the provisions of section 524(e) of the Bankruptcy Code, debtors are generally allowed to release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion*, 426 B.R. 114, 143 (Bankr. D. Del. 2010).  Courts have held that a plan may provide for the release by a debtor of non-debtor third parties after considering the specific facts and equities of each case. *See*, *e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. at 110 (approving plan releases upon consideration of relevant factors).

62.     Bankruptcy courts consider certain factors to determine whether a release by a debtor should be approved: (a) whether there is an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (b) whether the non-debtor has made a substantial contribution; (c) the essential nature of the release to the extent that, without the release, there is little likelihood of success; (d) an agreement by a substantial majority of creditors to support the release, specifically if the impacted class or classes "overwhelmingly" vote to accept the plan; and (e) whether there is a provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the release. *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 110); *see also Hsin Chi Su v. Offshore Grp. Inv. Ltd. (In re Vantage Drilling Int'l)*, 603 B.R. 538, 549 n.5 (D. Del. 2019) ("[A] person receiving a release generally must have provided something of value in return, such as by contributing assets to the estate or otherwise facilitating the debtor's reorganization."); *Spansion*, 426 B.R. at 143 n.47.

Importantly, a court need not find that all of the factors apply to approve a debtor's release of claims against non-debtors. *See*, *e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011). Rather, such factors are "helpful in weighing the equities of the particular case after a fact-specific review." *In re Indianapolis Downs*, 486 B.R. at 303. An analysis of these factors demonstrates that the proposed releases granted by the Debtors in favor of the Released Parties are fair, reasonable, and in the best interests of the Debtors and their Estates and are appropriate under the circumstances of these Chapter 11 Cases.

63.     *First*, there is an identity of interest among the Debtors and the Released Parties, as the Released Parties were instrumental in formulating the Plan. *See In re Zenith Elecs. Corp.*, 241 B.R. at 110. The *Zenith* court granted the releases sought by the debtor, holding that the various released parties had an identity of interest on the basis that they were instrumental in formulating the chapter 11 plan. *See id.*; *see also In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011) (holding that the debtors and their secured lenders "share a common goal of confirming the . . . Plan" and implementing the consummation thereof, thus giving rise to an identify of interest between those parties). The Plan is the result of extensive months-long negotiations among, and efforts by, the Released Parties regarding the satisfaction of all of the Debtors' prepetition secured debt, implementation of the Vendor RSA, and provision of additional liquidity needed to reorganize the Debtors' business. The bottom line is: absent the releases from the Debtors in favor of the Released Parties (including the Related Parties), the Debtors would not have been able to build the extraordinary level of consensus with respect to the Plan and the transactions contemplated thereby. Indeed, each Released Party, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and having the Debtors' businesses reorganized.

64.    *Second*, the Released Parties all made important contributions to the Chapter 11 Cases, including, in addition to the matters set forth above, by providing the funds available under the Prepetition Plan Sponsor Financing, the DIP Facility, and the Direct Investment Preferred Equity Raise.  Further, the Prepetition Secured Parties authorized the use of cash collateral to fund these Chapter 11 Cases.  These measures have improved liquidity throughout these Chapter 11 Cases, will provide for a return to parties that would otherwise receive nothing, and will provide financial and operational flexibility to the Reorganized Debtors after emergence from chapter 11.

65.    *Third*, the Released Parties' contributions and material concessions have allowed the Chapter 11 Cases to move expeditiously towards confirmation.  In particular, the Plan Sponsor and the DIP Lenders have provided the funding and support necessary to develop and implement the Plan.  Further, the releases from the Debtors are in exchange for the Direct Investment Preferred Equity Raise, as well as the ongoing commitment financially and operationally to support the post-Effective Date operations of the Reorganized Debtors.  These releases are integral to the Plan.  Without such releases, the Plan Sponsors and the DIP Lenders would not have been willing to contribute to the Plan process and formulation of the Plan, which presents the only meaningful path toward implementing the Restructuring Transaction.  In consideration for the releases from the Debtors, the Debtors and their Estates will receive mutual releases from potential Claims and Causes of Action of each of the Releasing Parties in addition to the significant benefits provided to the Debtors through this prepackaged chapter 11 process.  The Debtors do not believe they have material causes of action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan.  The releases granted by the Debtors provide finality and avoid significant delay

in consummating the Plan; therefore, the inclusion of these releases is justified and inures to the benefit of all of the Debtors' stakeholders.

66.    *Fourth*, the Plan provides for meaningful recoveries for all Classes affected by such releases.  Furthermore, as noted above, these releases are supported by the 195 Holders of Claims in the Voting Classes who voted in favor of the Plan.

67.    *Fifth*, no stakeholder has objected to the releases granted by the Debtors contained in the Plan.  195 Holders of Claims in the Voting Classes that cast a ballot voted to accept the Plan and provide the releases contained therein. Additionally, two creditors who voted to reject the Plan nevertheless opted into the releases. Although the Debtors received objections to confirmation of the Plan from two parties, each as discussed below, neither took issue with the release in the Plan.

68.    Accordingly, the Debtors believe that, under the specific facts and circumstances of these Chapter 11 Cases, the releases from the Debtors to the Released Parties constitute a valid exercise of the Debtors' business judgment and should be approved.

(b)    Third-Party Releases Are Likewise Appropriate.

69.    In addition to the releases granted by the Debtors, Article VIII.D of the Plan contains releases by certain non-debtor Holders of Claims (collectively, the "Releasing Parties")[8] against the Released Parties, to the extent permitted by law, for liability relating to the Debtors, the purchase, sale, or rescission of any security of the Debtors, the Plan, the Restructuring Transactions, or the Chapter 11 Cases, among other things (collectively, the "Third-Party

---

[8]      "Releasing Parties" means collectively and each of, and in each case in its capacity as such: (a) all Holders of Claims or Interests that vote to accept the Plan; (b) all Holders of Claims or Interests that are entitled to vote on the Plan who vote to reject the Plan and opt in to the releases provided for in Article VIII.D by checking the box on the ballot indicating that they opt in to granting such releases in the Plan submitted on or before the Voting Deadline; (c) the DIP Agent and DIP Lenders; (d) to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (e), solely to the extent the pertinent Entity can bind any such Affiliate to the terms of this Plan under applicable law; and (e) each Related Party of each Entity in clause (a) through this clause (e), solely to the extent the pertinent Entity can bind any such Related Party to the terms of this Plan under applicable law.. *See* Plan, Article 1.A.113.

Releases"). The Third-Party Releases include a carveout for claims that arise from actual fraud, willful misconduct or gross negligence. As discussed below, the Third-Party Releases satisfy the standard for approval of third-party releases established by the Third Circuit Court of Appeals and cases in this District and should be approved.

70.    In the Third Circuit, where releasing parties have consented to a release of claims against non-debtors, such releases will be approved under general principles of contract law. *See In re Regent Commc'ns., Inc.*, 2010 Bankr. LEXIS 5793, at *18 (Bankr. D. Del. Apr. 12, 2010); *First Fid. Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993) (noting that a consensual third-party release is no different from any other settlement or contract and does not implicate section 524(e)). Numerous courts have recognized that a chapter 11 plan may include a release of nondebtors by other nondebtors when such release is consensual. *See, e.g., Indianapolis Downs, 486 B.R. at 305* (collecting cases); *Spansion*, 426 B.R. at 144 (stating that "a third party release may be included in a plan if the release is consensual"); *Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *Zenith Elecs.*, 241 B.R. at 111 (approving non-debtor releases for creditors that voted in favor of the plan). Here, the Releasing Parties have expressly consented to the Third-Party Releases by either (i) voting in favor of the plan or (ii) checking the opt-in box on the Ballots, thereby consenting to such releases. *See In re Coram Healthcare Corp.*, 315 B.R. at 336 (finding that voting in favor of a plan of reorganization that provides for a third-party release indicates consent to the release, even without an explicit election opting to accept the third-party release provision).

71.    Courts in this district have held opt-in releases to be consensual. *See, e.g., In re Revitalid Pharmaceutical Corp. et al.*, Case No. 23-11704 (BLS) (Bankr. D. Del. Nov. 20, 2023) [D.I. 126]; *In re Lucira Health, Inc.*, Case No. 23-10242 (MFW) (Bankr. D. Del. Sept. 19, 2023)

[D.I. 652]; *In re Phoenix Services Topco, LLC*, et al., Case No. 22-10906 (MFW) (Bankr. D. Del. June 21, 2023) [D.I. 923]; *In re Ninepoint Medical, Inc.*, Case No. 20-12618 (KBO) (Bankr. D. Del. Jan. 7, 2021) [D.I. 136]; *In re Valeritas Holdings, Inc., et. al.*, Case No. 20-10290 (LSS) (Bankr. D. Del. June 8, 2020) [D.I. 410]; *In re PES Holdings, LLC*, Case No. 18-10122 (KG) (Bankr. D. Del. Apr. 2, 2018) [D.I. 1004].

72.     The Third-Party Release is an important part of the value-maximizing deal that will enable the Debtors to emerge from bankruptcy with a clean slate and a capital structure that is sustainable.  They are the product of extensive good faith, arm's-length negotiations and the Plan Sponsor would not have provided the indispensable capital and commitments to the Plan and the transactions contemplated thereby if they were presented with any litigation risk whatsoever. Indeed, the Third-Party Release was heavily and diligently negotiated as part of the Prepetition Plan Sponsor Financing and formulation processes.  Moreover, the Third-Party Releases are only binding on those parties who expressly consented to be bound by either voting in favor of the Plan or checking the opt-in box on the Ballot.  Here, over 195 creditors who submitted Ballots voted in favor of the Plan, thereby expressing their consent.  Additionally, two creditors who rejected the Plan checked the opt-in box, indicating their consent to be bound by the Third-Party Releases.

73.     For these reasons, the Debtors submit that the Third-Party Releases satisfy the requirements for such release under the law of this district and should be approved.

(c)     Exculpations Are Appropriate.

74.     Article VIII.E of the Plan provides for an exculpation limiting the liability of the Exculpated Parties relating to or arising out of the Chapter 11 Cases.  Further, the exculpation provision does not relieve any party of liability for actual fraud, willful misconduct or gross negligence.  In other words, unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful

misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring. *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *10 (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. 2010) (same).

75.     The standard within the Third Circuit for approving exculpation provisions in a plan provides that exculpations are appropriate when the protection is necessary and given in exchange for fair consideration. *See Cont'l Airlines*, 203 F.3d at 211–14.  Accordingly, courts have approved exculpation provisions when parties are exculpated for acts or omissions in connection with, or related to, "the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence." *In re PWS*, 228 F.3d at 245-46 (approving an exculpation clause releasing a creditors' committee and its professionals from third-party claims); *see also In re W.R. Grace & Co.*, 446 B.R. 96, 132-33 (Bankr. D. Del. 2011) (approving an exculpation clause exculpating non-debtor parties who were party to a settlement agreement).

76.     Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability. *See In re Drexel Burnham Lambert Grp, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (noting that excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

30

77.     Here, the Debtors and their managers, officers, directors, and professionals actively negotiated with holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases.  Such negotiations were extensive and the resulting agreements were implemented in good faith with a high degree of transparency.  As a result, the Plan enjoys unanimous support from members of the voting classes.  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Disclosure Statement, the Plan, and related documents in furtherance of the restructuring transactions.  Accordingly, the Court's findings of good faith *vis-à-vis* the Chapter 11 Cases should also extend to the Exculpated Parties.  In short, the exculpation is the product of good-faith, arm's-length negotiations and significant contributions by the Exculpated Parties.

78.     Without protection from liability, the Exculpated Parties would have been unwilling to cooperate in connection with the negotiation, formulation and distribution of the Plan. In addition, the exculpation is important in that it removes the threat of certain litigation against the Exculpated Parties, since the Debtors have indemnification obligations to such parties, the Debtors, their estates and the Reorganized Debtors.  Finally, interested parties received more than sufficient notice of the exculpation, and had ample time to raise any objections thereto, which no party has done.  Thus, the exculpation provision set forth in Article VIII.E is appropriate and consistent with applicable law.  Additionally, if the Court confirms the Plan and finds that, in accordance with section 1129(a)(3) of the Bankruptcy Code, the Plan was proposed in good faith and not by any means forbidden by law, exculpation is clearly appropriate.

(d)     <u>Injunction Is Appropriate</u>.

79.     The injunction provision set forth in Article VIII.F of the Plan implements the Plan's release, exculpation, and discharge provisions with respect to certain parties, including the Debtors, and, therefore, is a key component of the Plan.  Thus, to the extent the Court finds that

the exculpation and release provisions are appropriate, the Debtors respectfully submit that the injunction provision is also appropriate. *See* 11 U.S.C. § 105(a) (authorizing the Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code); *In re Premier Int'l Holdings Inc*., No. 09-12019 (CSS), 2010 WL 2745964, at *9 (Bankr. D. Del. Apr. 29, 2010) (approving injunctions along with release provisions). The Debtors respectfully submit that to the extent the Court finds that the Plan's discharge, exculpation, and release provisions are appropriate, the Court should approve the injunction provision of Article VIII.F.

### d. Securities Law Exemption Under Section 1145 of the Bankruptcy Code

80. Article VI.G of the Plan addresses securities law exemptions for the securities to be issued under the Plan. Under section 1145(a)(1) of the Bankruptcy Code:

> Except with respect to an entity that is an underwriter as defined in subsection (b) of this section, section 5 of the Securities Act of 1933 and any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker dealer in, a security do not apply to . . . the offer or sale under a plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan . . . in exchange for a claim against, interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate.

11 U.S.C. § 1145(a)(1).

81. Each of the Debtors, the Reorganized Debtors, the Plan Sponsor, and their respective affiliates are relying on section 1145(a)(1) of the Bankruptcy Code to exempt the offer and delivery of the New Common Stock and New Preferred Stock from the registration requirements of the Securities Act and state securities and "blue sky" laws insofar as: (i) the securities are issued by a debtor, an affiliate of a debtor, or a successor to a debtor under a plan approved by a Bankruptcy Court; (ii) the recipients of securities hold a claim against, an interest in, or a claim for administrative expense in the case concerning the debtor or such affiliate; and

(iii) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property.

82.     Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(1) of the Securities Act, unless the holder of such securities is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, subject to applicable law, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

*e.    The Plan Complies with Section 1123(d) of the Bankruptcy Code.*

83.     Section 1123(d) of the Bankruptcy Code provides that, "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."  11 U.S.C. § 1123(d).  Except for those contracts set forth in the Plan Supplement, all Executory Contracts and Unexpired Leases are being assumed under the Plan, the rights of all parties to such contracts and leases will be unaffected by the Plan, and the Debtors will pay all amounts due (and will cure any monetary defaults) under such contracts and leases in the ordinary course and pursuant to the terms of such Executory Contracts and Unexpired Leases.  Accordingly, the Plan complies with section 1123(d) of the Bankruptcy Code.

**B.     Section 1129(a)(2): The Debtors Have Complied with Applicable Provisions of the Bankruptcy Code.**

84.     Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(2).  The principal purpose of this section is to ensure that a plan proponent has complied with section 1125 in the solicitation of acceptances of the plan.  *In re Resorts Int'l Inc.*, 145 B.R. 412, 468 (Bankr.

D.N.J. 1990); *see also* H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 412 (1977), *reprinted in* 1978

U.S.C.C.A.N. 5963, 6368.

85.     Here, the Debtors, as plan proponents, have complied with the applicable

provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and other applicable

law in (a) the prepetition solicitation of votes on the Plan, (b) transmitting the Plan, the Disclosure

Statement, the Ballots, and related documents and notices, and (c) tabulating the votes on the Plan.

Accordingly, the Debtors have fully complied with all provisions of the Bankruptcy Code,

including, in particular, the provisions of section 1125 of the Bankruptcy Code, and the Plan

proponents thus satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code.

## C.      *Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law.*

86.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be

"proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Courts

in the Third Circuit have found that good faith requires that a plan be "proposed with honesty,

good intentions and a basis for expecting that a reorganization can be effected with results

consistent with the objectives and purposes of the Bankruptcy Code." *In re Zenith Elecs. Corp.*,

241 B.R. at 107; *accord In re Century Glove, Inc.*, No. 90-400-SLR, 1993 WL 239489, at *4 (D.

Del. Feb. 10, 1993) (quoting *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir.1985))

("'[W]here the plan is proposed with the legitimate and honest purpose to reorganize and has a

reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied.'"). A

court should also consider the totality of the circumstances surrounding a plan to determine if it

has been proposed in good faith. *See In re New Valley Corp.*, 168 B.R. 73, 81 (Bankr. D.N.J.

1994).

87.     The Plan is the product of months of arm's-length negotiations by and among the Debtors, the Plan Sponsor and the Vendor Group, aimed at best positioning the Debtors for long-term growth and success.  Specifically, the Plan deleverages the Debtors' balance sheet, preserves jobs, honors the Debtors' commitments to Vendors under the Vendor RSA, and recapitalizes the Debtors to position their business for success upon emergence from these Chapter 11 Cases.  This comports with one of the principal purposes of chapter 11: to enable a distressed entity to reorganize its affairs, prevent job losses, and stave off the adverse economic effects associated with disposing of assets at liquidation value.

88.     The Debtors proposed the Plan with the legitimate and honest purpose of reorganizing the Debtors' prepetition debt and maximizing distributions and/or recoveries to all stakeholders.  Additionally, the Plan has been proposed in compliance with applicable law, rules and regulations.  The Plan was conceived and proposed with the "honest purpose" and "reasonable hope of success" by which "good faith" under section 1129(a)(3) of the Bankruptcy Code is measured.  *See In re Sun Country Dev., Inc.*, 764 F.2d at 408.  Accordingly, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

### D.     *Section 1129(a)(4): The Payment of Services and Expenses Is Subject to Bankruptcy Court Approval.*

89.     Section 1129(a)(4) of the Bankruptcy Code requires that any payments by a debtor "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case," either be approved by the Court as reasonable or subject to approval of the Court as reasonable.  11 U.S.C. § 1129(a)(4).  This section requires disclosure of fees and costs and court approval of such costs at confirmation or a later time.

90.     Payments made or promised by the Debtors for services or for costs and expenses in, or in connection with, these Chapter 11 Cases, or in connection with the Plan and incident to

the Chapter 11 Cases, have been approved by, or are subject to approval of, the Court as reasonable. Specifically, Article II.C of the Plan sets forth a procedure for Court approval of any Professional Fee Claims. The procedure for the Court's review and ultimate determination of the fees, costs and expenses to be paid by the Debtors satisfies the requirements of section 1129(a)(4) of the Bankruptcy Code. *See In re Resorts Int'l*, 145 B.R. at 475-76 (stating that as long as fees, costs, and expenses are subject to final approval of the court, section 1129(a)(4) of the Bankruptcy Code is satisfied).

### E. Section 1129(a)(5): Necessary Information Regarding the Identity of Directors and Officers Has Been Disclosed.

91.     Section 1129(a)(5) of the Bankruptcy Code requires that a plan proponent disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor . . . or a successor to the debtor under the plan." 11 U.S.C. § 1129(a)(5)(A)(i). Section 1129(a)(5) requires that the appointment of such individual be "consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1129(a)(5)(A)(ii). As discussed in detail above in connection with the requirements of section 1123(a)(7), the Debtors have made these necessary disclosures in the Plan Supplement, and the Plan thus satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

### F. Section 1129(a)(7): The Plan Is in the Best Interests of Creditors and Interest Holders.

92.     The Bankruptcy Code protects creditors and equity holders who are impaired by the Plan and have not voted to accept the Plan through the "best interests" test of section 1129(a)(7). The "best interests" test requires that holders of impaired claims or interests that do not vote to accept the plan "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such

36

date." 11 U.S.C. § 1129(a)(7)(A).  If the Court finds by a preponderance of the evidence that each non-consenting member of an impaired class will receive at least as much under the plan as it would receive in a chapter 7 liquidation, the plan satisfies the best interests test.  *See*, *e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 142 (D. Del. 2012); *In re Crowthers McCall Pattern*, *Inc*., 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990).

93.     Here, the Debtors, with the assistance of SRVP, prepared a Liquidation Analysis that is attached as <u>Exhibit D</u> to the Disclosure Statement, which represents the Debtors' best estimate of the cash proceeds, net of liquidation-related costs, that would be available for distribution to Holders of Claims and Interests were the Debtors to be liquidated under chapter 7 of the Bankruptcy Code.

94.     As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by the Holders of Claims or Interests as compared to distributions under the Plan.  Consequently, the Debtors believe that confirmation of the Plan will provide a substantially greater return to Holders of Claims and Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

95.     The Liquidation Analysis was based on a variety of assumptions, which are detailed in the notes to the Liquidation Analysis, and which the Debtors believe are reasonable under the circumstances.  The Liquidation Analysis assumes that a chapter 7 trustee would be forced to sell the Debtors' assets in a traditional liquidation, which would result in the loss of most, if not all, of the going-concern value attributable to the Debtors' assets.  The Liquidation Analysis also assumes that the liquidation of the Debtors' businesses would result in the assertion of additional claims against the Debtors' estates, including employee-related claims such as severance, tax liabilities,

claims related to the rejection of Executory Contracts, litigation claims, and other claims.  These claims could be significant and in some cases be entitled to priority over existing Claims and Interests, further diminishing the recovery available to Holders of Claims and Interests in a hypothetical liquidation under chapter 7 of the Bankruptcy Code.

96.     The Liquidation Analysis also assumes that in a hypothetical chapter 7 liquidation, the Debtors' estates would incur: (a) wind down costs, consisting of ordinary course general and administrative costs required to operate the Debtors' businesses; (b) chapter 7 trustee fees, assumed to not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1.0 million, and fees not to exceed 3% of such moneys in excess of $1.0 million upon all moneys disbursed or turned over by a chapter 7 trustee; and (c) the allowed administrative expenses incurred by the chapter 7 trustee, including professional fees, assumed to be 2.5% of the gross property liquidation proceeds realized.

97.     The Liquidation Analysis provides estimated recoveries for each Class under the Plan in a hypothetical chapter 7 liquidation.  The following chart sets forth the estimated recoveries for each Holders of Claims in the Voting Classes, as well as holders of DIP Claims under the Plan under a hypothetical chapter 7 scenario as compared to the estimated recoveries under the Plan:

| Class | Claim or Interest | Plan Recovery | Estimated Liquidation Recovery | | |
|-------|-------------------|---------------|--------|--------|--------|
| | | | **Low** | **Mid** | **High** |
| n/a | DIP Claims | 100% | 0% | 0% | 0% |
| 3 | Senior Secured Note Claims | 87% | 0% | 16% | 56% |
| 4 | MCA Claims | 90% | 0% | 0% | 0% |
| 5 | Subordinated Secured Note Claims | 100% | 0% | 0% | 0% |
| 7 | Vendor Claims | 55% | 0% | 0% | 0% |
| 8 | Convenience Claims | 65% | 0% | 0% | 0% |

98.     As shown above, none of the Voting Classes stand to do better in a liquidation

scenario when compared to this Plan.  In fact, only Holders of Claims in Class 3 would receive *any* recovery in a liquidation scenario, while all other Voting Classes and the Holders of DIP Claims stand to receive *nothing* if the cases were converted to a chapter 7 liquidation.  As such, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

> **G.      *Section 1129(a)(8) and (10): Acceptance by Impaired Class.***

99.      Subject to section 1129(a)(10), section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept the plan or not be impaired by the plan.  11 U.S.C. § 1129(a)(8).  Section 1129(a)(8) is not satisfied because the Plan provides that certain Holders of Impaired Claims and Interests are deemed to reject the Plan.  However, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code, which requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider" if a class of claims is impaired by a plan of reorganization.  11 U.S.C. § 1129(a)(10).  As set forth above and in the Voting Declaration, Holders of Claims Voting Classes voted overwhelmingly to accept the Plan.  As such, section 1129(a)(10) is satisfied.

> **H.      *Section 1129(a)(9): The Plan Provides for Payment in Full of Allowed Priority Claims.***

100.      Section 1129(a)(9) of the Bankruptcy Code provides that holders of certain types of priority claims must receive specific treatment depending on the circumstances of such claims, unless such holders agree to different treatment.  *See* 11 U.S.C. § 1129(a)(9).  Except to the extent that the Holder of a particular Claim has agreed to different treatment on account of such Claim, the Plan provides for the payment in full of all Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims against the Debtor in accordance with section 1129(a)(9) of the Bankruptcy Code.  *See* Plan, Articles II and III.  The Plan also provides that the deadline for submission by Professionals for Court approval of Professional Fee Claims will be

forty-five (45) days after the Effective Date.  The Plan thus satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

## I.      *Section 1129(a)(11): The Plan Is Feasible.*

101.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).  This requirement, commonly known as the "feasibility" standard, typically encompasses two interrelated determinations where the plan does not contemplate the liquidation of the debtor: (a) the debtor's ability to consummate the provisions of the plan, and (b) the debtor's ability to reorganize as a viable entity.  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Lakeside Glob. II, Ltd*., 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (stating that the definition of feasibility "has been slightly broadened and contemplates whether [a] debtor can realistically carry out its plan . . . and whether the plan offers a reasonable prospect of success and is workable").

102.    Based on the annual financial projections for financial years 2024 through 2026 (the "Financial Projections"), attached to the Disclosure Statement as Exhibit C, and subject to the assumptions underlying such projections, the Debtors believe they will have sufficient liquidity after honoring their obligations under the Plan to sustain viable business operations going forward. This conclusion flows, in part, from (a) the recapitalization achieved by the Direct Investment Preferred Equity Raise, (b) the reduction in funded debt and interest expense achieved through the Plan, including through the equitization of DIP Claims, and (c) taking the Company private, which will materially reduce administrative expense costs associated with being a publicly traded entity.

103.    Indeed, upon emergence, the Reorganized Debtors will have no funded debt obligations.  The going-private path will further result in significant bottom line cost savings. Additionally, after making distributions under the Plan, a substantial portion of the $26 million Direct Investment Preferred Equity Raise will be available to the Debtors to fund ongoing business operations.  Therefore, based on the above, confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

104.    More specifically, the Financial Projections are premised on, among other things, various assumptions regarding the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters.  In preparing these projections, the Debtors analyzed their ability to fulfill their obligations under the Plan and considered their estimated administrative costs.  The projections also account for the restructuring of the Debtors' existing funded debt, which de-leverages the Debtors' balance sheet.  Thus, based on the Financial Projections, which reflect financial projections for each of the fiscal years ending 2024, 2025 and 2026, the Debtors submit that these projections constitute a fair and reasonable outlook of the Debtors' future performance.

105.    The Debtors believe they will be able to implement their long-term business plan and emerge from these Chapter 11 Cases as a stronger and more competitive business on account of the Debtors' restructuring and the new working capital and liquidity provided through the Direct Investment Preferred Equity Raise under the Plan.  The Plan will enable the Reorganized Debtors to stabilize their capital structure, reduce funded debt to zero, provide them with access to needed liquidity and strengthen their go-forward operations, thus best positioning the Reorganized Debtors for long-term success.  Notably, the Plan will allow the Debtors to minimize disruptions to their go-forward operations while effectuating a value-maximizing, largely refinancing

transaction through the Plan.

106.    Finally, as discussed above, the Plan is the result of extensive arm's-length negotiations and discussions among the Debtors and their key stakeholders, including the Plan Sponsor and the Vendor Group, all of whom have scrutinized the Plan and Disclosure Statement, and the Plan enjoys near unanimous support from impaired voting creditors.  For these reasons, the Debtors submit that the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

**J.      Section 1129(a)(12): The Plan Provides for Full Payment of Statutory Fees.**

107.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 [of title 28 of the United States Code], as determined by the court at the hearing on confirmation of the plan." 11 U.S.C. § 1129(a)(12).  Section 507 provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).

108.    In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Article II.E of the Plan provides that statutory fees under 28 U.S.C. § 1930(a)(6) will be paid in the ordinary course in each of the Chapter 11 Cases, as applicable, until the Court enters a final decree closing the Chapter 11 Cases.  The Plan thus satisfies section 1129(a)(12) of the Bankruptcy Code.

**K.      Sections 1129(a)(6), 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) Are Inapplicable.**

109.    The provisions of sections 1129(a)(6), (13), (14), (15) and (16) are inapplicable here.  Specifically: (a) the Plan does not provide for any rate changes by the Debtors such as would implicate section 1129(a)(6); (b) the Debtors do not owe any retiree benefits such as would implicate section 1129(a)(13); (c) the Debtors have no domestic support obligations that would implicate section 1129(a)(14); (d) none of the Debtors are individuals, rendering section 1129(a)(15) inapplicable; and (e) no transfers under the Plan are subject to laws that govern the

transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust, such that section 1129(a)(16) is also inapplicable.

**L.    *The Plan Complies with Section 1129(b) of the Bankruptcy Code.***

110.    Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances where the plan is not accepted by all impaired classes of claims and equity interests.  This mechanism is known colloquially as "cram down."  Section 1129(b) provides in pertinent part:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. §1129(b)(1).

111.    Accordingly, under section 1129(b) of the Bankruptcy Code, the Court may "cram down" a plan over a rejecting impaired class as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes.  *See id.*; *John Hancock Mut. Life*, 987 F.2d at 157 n.5 ("Under [section 1129(b) of the Bankruptcy Code], the plan must also satisfy all of the requirements of [section 1129(a) of the Bankruptcy Code] except for subsection (a)(8) . . . and must not 'discriminate unfairly' against and must be 'fair and equitable' with respect to all impaired classes that do not approve the plan.").

112.    Claims and Interests in Class 9 (General Unsecured Claims), 10 (Intercompany Claims), and Class 12 (Existing Equity Interests) are Impaired under the Plan, and the Holders of such Claims and Interests are deemed to reject the Plan.  Additionally, Claims in Class 11 (Intercompany Interests) may be Impaired, and the Holders of such Claims may be deemed to reject the Plan, as determined by the Debtors or Reorganized Debtors, as applicable, with the

consent of the Plan Sponsor.  The Debtors, however, respectfully submit that the Plan may, nonetheless, be confirmed over the rejection by such Classes pursuant to section 1129(b) of the Bankruptcy Code because the Plan does not discriminate unfairly and is fair and equitable with respect to all non-accepting Impaired Classes.  Moreover, the voting Classes voted in favor of the Plan, meaning the unfair discrimination and fair and equitable analysis is inapplicable to such Classes.  *In re W. Real Est. Fund, Inc.*, 75 B.R. 580, 586 (Bankr. W.D. Okla. 1987) (Discrimination is prohibited in the cram-down provision only with respect to impaired class which has not accepted the plan, and once class has accepted, class is no longer utilized in comparison for purposes of determining existence or nonexistence of discrimination between classes).

1. The Plan Does Not Discriminate Unfairly.

113.    The Plan does not discriminate unfairly with respect to Impaired Classes that were deemed to have rejected the Plan.  While the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.  *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) (explaining that "whether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis"); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (finding that determination of unfair discrimination requires court to "consider all aspects of the case and the totality of all the circumstances").  At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.  *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654-55 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986).  In other

words, section 1129(b)(1) does not prohibit discrimination between classes; it prohibits only discrimination that is unfair. *In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990). Accordingly, between two classes of claims or two classes of interests, there is no unfair discrimination if (a) the claims or interests in each such class are dissimilar from those in the other class (*see, e.g.*, *Johns-Manville Corp.*, 68 B.R. at 636), or (b) taking into account the particular facts and circumstances of the case, there is a reasonable basis for disparate treatment of otherwise similar claims or interests. *See, e.g.*, *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); *In re Rivera Echevarria*, 129 B.R. 11, 13 (Bankr. D.P.R. 1991).

114.    Claims and Interests in deemed rejecting Classes are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests. The Plan does not discriminate unfairly against Class 9 (General Unsecured Claims), 10 (Intercompany Claims), and Class 12 (Existing Equity Interests) because there are no other classes of Claims or Interests similarly situated to the Claims or Interests in such Classes 9, 10, and 12.

115.    While Claims in Classes 7, 8, 9, and 13 are all unsecured claims, there is a reasonable basis based on the facts and circumstances of these Chapter 11 Cases for their disparate treatment.  Classes 7 and 8 are composed of Claims of Vendors that are essential to the business operations of the Debtors.  As discussed in detail in the First Day Declaration, the Debtors hold virtually no inventory and therefore rely on the Vendors to fulfill orders placed by customers. Without the Vendors, the Debtors' business simply would not exist.  Class 9 is composed of Claims of non-Vendor trade creditors that are not essential to the Debtors' operations.  Class 13 is composed exclusively of the customer claims in the form of store credits and gift cards. Thus, unlike Holders of Claims in Class 9, the Holders of Claims in Classes 7, 8 and 13 are critical to the Debtors' future success: without Vendors to supply inventory and customers to make purchases

and provide revenue, the Debtors would have no business operations to conduct. The risk of alienating Holders of Classes 7, 8 and 9 is existential. On the other hand, the Class 9 Claims are held by trade creditors that are not essential to the Debtors' continued business efforts. No harm will befall this reorganization if such Claims are not satisfied.

116.    Similarly, Claims in Class 11 (Intercompany Interests) are entirely unique from any other Class of Claims and, therefore, appropriately placed in their own Class. The Debtors separately classified Intercompany Interests from other Claims to preserve the option to (x) Reinstate or (y) cancel, release and extinguish such Interests. Such treatment allows the Debtors greater flexibility to determine whether it is more efficient to maintain their organizational structure and certain entity relationships when they are implementing the Restructuring Transactions rather than prior thereto. Significantly, the optionality does not affect any stakeholders' recovery under the Plan and is intended for only administrative convenience in the restructuring process.

### 2.  The Plan Is Fair and Equitable.

117.    Sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if, under the plan, no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest. *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii). Generally, this requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest. *See 203 N. LaSalle P'ship*, 526 U.S. at 459. Additionally, in order for a plan to be "fair and equitable," no creditor may be paid more than what it is owed (i.e., no class of creditors may receive more than 100% of its claims). *See* 7 Collier on Bankruptcy ¶1129.03[4][a];

*see also In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be."); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) ("[A] corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims." (Citation omitted)).

118.    Distributions of estate property under the Plan are being made in the order of priority prescribed by the Bankruptcy Code and in accordance with the absolute priority rule. Distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code and in accordance with the absolute priority rule. As shown in Article III of the Plan, no Holder of a Claim or Interest in a Class junior to any impaired rejecting Class will receive or retain any property under the Plan on account of such junior Claim or Interest. With respect to Holders of Claims in Class 13, whose Claims will be Reinstated under the Plan, such Claims are equal in priority to Claims in Class 9, and are senior in priority to Holders of Claims of Interest in Classes 10, 11, and 12. Further, no Holder of a Claim or Interest in a Class senior to any impaired rejecting Class will receive or retain any property under the Plan in an amount in excess of such Holder's Claims or Interests. Accordingly, the Plan is "fair and equitable" and, therefore, satisfies section 1129(b) of the Bankruptcy Code.

**M.    *The Plan Complies with Sections 1129(c)-(e) of the Bankruptcy Code.***

119.    Subject to certain conditions, section 1129(c) of the Bankruptcy Code requires that the Court confirm only one plan. The Plan is the only plan being confirmed in these Chapter 11 Cases with respect to the Debtors and, therefore, section 1129(c) is satisfied. The principal purpose of the Plan is not the avoidance of taxes or the application of section 5 of the Securities Act of 1933, and no interested party has filed an objection alleging otherwise. The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code. These Chapter 11 Cases are

47

not "small business cases" as defined in the Bankruptcy Code and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable here.

### III.    Cause Exists to Waive the Stay of the Confirmation Order.

120.    The Debtors request that the Confirmation Order be effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e). Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 3020(e).

121.    As noted above, the Plan and the related transactions have been extensively negotiated in good faith by sophisticated parties and with a high degree of transparency. Additionally, each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.  For these reasons, the Debtors, their advisors and other key constituents are working to expedite the consummation of transactions under the Plan so that the Effective Date of the Plan may occur as soon as possible after the Confirmation Date.  Such relief is in the best interests of the Debtors' Estates and creditors and will not prejudice any parties in interest.  Good cause exists for the Court to exercise its discretion and waive any stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately.

### IV.    Plan Modifications Do Not Require Re-Solicitation

122.    Under section 1127 of the Bankruptcy Code, a plan proponent may modify a plan at any time before confirmation as long as the plan, as modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the proponent of the modification complies with section 1125 of the Bankruptcy Code.  In addition, with respect to modifications made after acceptance but prior to confirmation, Bankruptcy Rule 3019 provides, in relevant part:

48

> [A]fter a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

FED. R. BANKR. P. 3019(a).

123.    A modification that adversely changes treatment is material if it "so affects a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance."  9 COLLIER ON BANKRUPTCY, ¶ 3019.01 (16th ed. 2009); *see also In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988).  Re-solicitation is appropriate only if "the modification adversely affects the interests of a creditor who has previously accepted the plan, in more than a purely ministerial de minimis manner." *In re Frontier Airlines, Inc.*, 93 B.R. 1014, 1023 (Bankr. D. Colo. 1988).  Bankruptcy Rule 3019 allows a creditor that is negatively impacted by a change to accept the change in writing.  Moreover, Bankruptcy Rule 3019(a) provides that if the court finds "that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan."

124.    The Debtors made certain modifications reflected in the Plan that was filed on January 12, 2024, namely the inclusion of Class 13 (Customer Program Claims).   The modifications resolve certain informal objections or concerns raised by the United States Trustee with respect to notice of Claims held by the Debtors' customers.  Importantly, the modifications do not alter recoveries to the Holders of Claims or Interests. Fed. R. Bankr. P. 3019(a).  Courts have held that such modifications do not require re-solicitation of a plan and disclosure statement.

*See, e.g., In re Century Glove, Inc.*, 1993 WL 239489, at *13 (plan was modified after solicitation to change treatment of a single creditor with no change in the treatment of any other interested parties in the plan, and court held that because the modification did not materially and adversely impact any creditor that voted for the plan, there was no need to re-solicit.); *In re Temple Zion*, 125 B.R. 910, 914 (Bankr. E.D. Pa. 1991) (allowing plan modification without need to re-solicit plan because modification affected interest of one creditor, and did not affect any other impaired class in any way); *In re Mount Vernon Plaza Cmty. Urban Redev. Corp. I*, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987) (approving plan modifications without re-solicitation that included, among other modifications, an increase in the administrative expense claims proposed to be paid at the closing of the contemplated sale of the debtors' assets, because such modification did not adversely change the treatment of the claim of any creditor under the plan).  Notably, courts have approved modifications to plans where the treatment of creditors was changed without the need for re-solicitation.  *See, e.g., In re City of Detroit,* 524 B.R. 147, 253 (Bankr. E.D. Mich. 2014) (approving several plan modifications without need to re-solicit because modifications incorporated creditor settlements that either maintained or improved the treatment of claims); *In re LMR, LLC,* 496 B.R. 410, 441 (Bankr. W.D. Tex. 2013) (plan modifications added 6% interest to be paid to unsecured creditors and clarified the scope of AVF's lien retention and default remedies, which the court concluded did not adversely change the treatment of any creditor or interest holder, and all creditors and interest holders who previously accepted the prior plan were deemed to accept the modified plan).

125.    Accordingly, the modifications to the Plan comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  The Voting Classes have not objected to the inclusion of Class 13, and notably, the inclusion of Class 13 does not affect the treatment of Claims

held by the Voting Classes under the Plan.  Notably, after the Debtors filed the modified Plan on January 12, 2024, eleven creditors voted in favor of the Plan.  The modified Plan was served to all Voting Creditors by first class mail on January 12, 2024 [D.I. 130].  Because the modifications do not adversely affect the interests of any creditor, the Debtors submit that re-solicitation is not necessary or appropriate.  Therefore, the Debtors submit that no additional solicitation or disclosure is required on account of the modifications, which should be deemed accepted by all creditors that previously accepted the Plan.

## V.      Objections to the Plan Should be Overruled

126.    The deadline to file objections to the Plan was January 26, 2024, at 4:00 p.m., prevailing Eastern Time (together with extensions granted to the U.S. Trustee, the "Plan Objection Deadline").  As of the Plan Objection Deadline, the Debtors received two formal objections to confirmation of the Plan, as well as certain informal comments to the Plan from the U.S. Trustee. As of the date hereof, the Debtors have consensually resolved all of the U.S. Trustee's comments to the Plan by modifying certain Plan provisions as set forth in the *Second Amended Chapter 11 Plan of Reorganization of PARTS iD, Inc. and PARTS iD, LLC*, filed contemporaneously herewith.

127.    Two limited objections to confirmation of the Plan were filed by Google, LLC ("Google") [D.I 133] (the "Google Objection") and IDParts, LLC ("IDParts") [D.I. 134] (the "Initial Objection"), as well as an untimely "supplemental" objection by IDParts [D.I. 142] (the "Supplemental Objection," and together with the Initial Objection, the "IDParts Objections").

### A.      *Google Objection*

128.    The Google Objection asserts two arguments: first, that the Disclosure Statement does not contain adequate information because it does not disclose the risk that Google will not provide advertising services to the Debtors after the Effective Date, and second, that the Plan was not proposed in good faith. Each of these arguments is without merit.

129.    Pursuant to the Second Plan Supplement, the Debtors, in the exercise of their sound business judgment, determined to reject the Advertising Services Agreement with Google, consistent with their rights under section 365 of the Bankruptcy Code.  Accordingly, no cure amount is due to Google because its contract will not be assumed by the Debtors.

130.    Rejection of the Google contract does not render the Disclosure Statement inadequate.  Indeed, as stated in the Google Objection, a disclosure statement must provide adequate information for holders of claims and interests to make an informed judgment about the plan.  *See* 11 U.S.C. § 1125 (a)(1).  Whether a disclosure statement contains adequate information is determined by the facts and circumstances of each case.  *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988).  A disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."  *Ferretti*, 128 B.R. at 19.  A court will deny approval of a disclosure statement if it is "inaccurate or is 'replete with deficiencies.'"  *In re Foxwood Hills Prop. Owners Ass'n, Inc.*, No. CV 20-02092-HB, 2021 WL 3059716, at *5 (Bankr. D.S.C. June 1, 2021).  The Disclosure Statement is neither inaccurate nor deficient.

131.    As discussed in section I.A above, the Debtors have exceeded the standard set by section 1125 of the Bankruptcy Code. The Disclosure Statement provides a description and summaries of (a) both the Plan and the Debtors' related reorganization efforts; (b) certain events and relevant negotiations preceding the commencement of these chapter 11 cases; (c) the key terms of the Plan Restructuring; (d) risk factors affecting consummation of the Plan and the Plan Restructuring; (e) a liquidation analysis setting forth an estimated recovery that Holders of Claims and Interests would receive in a hypothetical chapter 7 case; (f) financial information that is relevant in determining whether to accept or reject the Plan; (g) securities law consequences of the

Plan; (h) federal tax law consequences of the Plan; (i) classification and treatment of Claims and Interests under the Plan, including which Classes were entitled to vote; (j) the Debtors' corporate history, corporate structure, business operations, and prepetition capital structure; (k) the effects of confirmation of the Plan; and (l) the releases and exculpations contemplated under the Plan. The Debtors' decision to reject the Google contract does not impact the treatment of any Class of creditors, timing of distributions or contingencies to such distributions. Nor does it impact the Reorganized Debtors' post-Effective Date operations. In fact, the Debtors' rejection of the Google contract was factored into the financial projections set forth at <u>Exhibit C</u> to the Disclosure Statement. For the reasons set forth in this Memorandum, the Disclosure Statement contains adequate information in accordance with section 1125(a)(1) of the Bankruptcy Code and should be approved.

132.    Google next contends that the Plan cannot be confirmed because it "is not proposed in good faith as it relates to Google." Google Obj. ¶ 15. However, the satisfaction of each unsecured creditor is not the standard set by section 1129(a)(3) of the Bankruptcy Code. Courts in this Circuit have found that good faith requires that a plan be "proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." *In re Zenith Elecs. Corp.*, 241 B.R. at 107. The Debtors proposed the Plan with the legitimate and honest purpose of reorganizing their prepetition debt, maximizing distributions to stakeholders, and exiting chapter 11 as a recapitalized business positioned for long-term success. The Plan has been proposed in compliance with applicable law, rules and regulations. Additionally, as described above, the Plan was overwhelmingly accepted by each of the Voting Classes. The Plan was thus conceived and proposed with the honest purpose and reasonable hope of success by which "good faith" under

section 1129(a)(3) of the Bankruptcy Code is measured.  The Google Objection should be overruled and the Plan confirmed.

### B.  *IDParts Objections*

133.    PARTS iD, LLC and IDParts, LLC have been engaged in a trademark litigation action in the United States District Court for the District of Massachusetts (the "Massachusetts District Court") since June 30, 2020 (the "Trademark Litigation").  The Debtors do not dispute the procedural history of the Trademark Litigation set forth in the IDParts Objections, have agreed with counsel to IDParts to change the Debtors' corporate names, and have included language requiring the Debtors to change their corporate names in the proposed Confirmation Order, which the Debtors have shared with counsel to IDParts.  Despite such agreement, the Initial Objection is singularly focused on requiring the Debtors to change their names: "The simple solution to the Reorganized Debtors' ongoing infringement of IDParts' mark is for the Reorganized Debtors to change their names before emerging from bankruptcy." Initial Obj. ¶ 14.  The Debtors hope to emerge from these Chapter 11 Cases within days and, in accordance with their corporate governance, must take formal steps to approve the name changes.  The Debtors therefore submit that the proposed Confirmation Order, which provides that the Debtors shall change their corporate names and cease use of the website https://www.partsidinc.com within 30 days of the Effective Date, sufficiently addresses the concerns raised in the Initial Objection.

134.    The Supplemental Objection does not even suggest a basis upon which confirmation of the Plan should be denied. The Debtors are authorized under section 365(b)(3)(B) of the Bankruptcy Code to retain causes of action. The exercise of this right is no basis for denial of confirmation. The IDParts Objections should be overruled.

135.    The Debtors reserve their rights to introduce further evidence or assert further responses to any objections at the Confirmation Hearing.

54

## <u>CONCLUSION</u>

136.    For all the reasons set forth herein, in the Peker Declaration and the Voting Declaration, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Court approve the Disclosure Statement and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, overruling any remaining objections, and granting to the Debtors such other and further relief as is just and proper.

Dated: January 30, 2024
       Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

 */s/  R. Craig Martin*
R. Craig Martin (DE 5032)
1201 N. Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: craig.martin@us.dlapiper.com

- and -

Erik F. Stier (Admitted *pro hac vice*)
500 8th Street, NW
Washington, D.C. 20004
Telephone: (202) 799-4258
Facsimile: (202) 799-5000
Email: erik.stier@us.dlapiper.com

*Proposed Counsel for the Debtors*